DECISION
The issue before the Court concerns the continued care of James Steven Gonsalves by the Department of Mental Health, Retardation Hospitals (hereinafter referred to as DMHRH) pursuant to Chapter 5.3, Title 40.1 (hereinafter referred to as Act) entitled "Incompetency to Stand Trial and Persons Adjudged Not Guilty By Reason of Insanity." Pursuant to R.I.G.L. 1956 (1990 Reenactment) § 40.1-5.3-9, the Director of the DMHRH (hereinafter referred to as Director) has petitioned the Court for transfer of James Steven Gonsalves from the Forensic Unit of the Eleanor Slater Hospital (hereinafter Forensic Unit)[1] to the Adult Correctional Institution (hereinafter referred to as ACI). Respondent, Mr. Gonsalves objects to transfer. Following hearings, decision was reserved, pending the filing and review of Supplemental Memoranda.
FACTS/TRAVEL
The Respondent, James Steven Gonsalves, (hereinafter referred to as Gonsalves) was convicted on Providence Indictment P1/73-1780 of the crime of common law rape in 1974 and sentenced to a term of thirty (30) years at the ACI. According to the testimony offered at the hearing on this matter Gonsalves, since he was sentenced, had been transferred to the Forensic Unit of the Institute of Mental Health on several prior occasions.
On August 24, 1994, pursuant to the Rhode Island Forensic §40.1-5.3-1 et. seq., specifically §§ 6 and 7, and Superior Court Administrative Order 86-1[2], an ex parte petition was filed seeking the right to commit Gonsalves to the Forensic Unit. Said petition was granted.
Prior to this commitment, while at the ACI, Mr. Gonsalves' "bizarre behavior" led to psychiatric evaluation by Martin Bauermeister, Ph.D., M.D. (Respondent Exhibit B). Upon evaluation on August 16, 1994, Dr. Bauermeister opined that Gonsalves is "suffering from psychotic illness," that Gonsalves "should be in the setting of a mental hospital where he can receive skilled psychiatric nursing care and medical-psychiatric treatment as appropriate" and that "the condition of [Gonsalves] satisfied the criteria for insanity as set out in Sections 40.1-5.3-6 and40.1-5.3-7 of the Rhode Island General Laws." Id.
Dr. Bauermeister's report further noted that Gonsalves had a long history of unmitigated violence, of many psychiatric diagnoses, and inconsistent compliance with medication; that Gonsalves suffers from a psychotic illness, he continues to have grandiose delusions, he is dangerous and refuses treatment. (Respondent's Exhibit B). Gonsalves told Dr. Bauermeister that he was not going to take any medications; he explained that there was nothing wrong with him. Id. His continuous attacks on correctional staff necessitated his confinement under minimal privilege conditions in a psychiatric cell of the ACI hospital ward, which continuous confinement constitutes one of the stresses under which Gonsalves has become psychotic in the past.Id. According to Dr. Bauermeister, in addition to himself, correctional staff, administration, and mental health staff were concerned that Gonsalves had to be kept under conditions of severe deprivation. Id.
Petitioner, in addition, obtained an evaluation of Gonsalves from Dr. Lorin H. Mimless, a psychiatrist. In his report (Respondent Exhibit C), Dr. Mimless wrote that he became familiar with Gonsalves over a period of time beginning approximately five years ago while working as a treating psychiatrist at the ACI. (Respondent Exhibit C). On review of Gonsalves' record, Dr. Mimless noted that: (1) there have been major psychiatric decompensations fairly consistently over the years which have required significant behavioral and medical intervention, (2) Gonsalves has received several psychiatric diagnoses including schizophrenia, chronic undifferentiated and paranoid schizoaffective disorder, organic affective disorder, and major personality disorder with paranoid and schizotypal features, and (3) Gonsalves has been on different prescribed medications but has been sporadically noncompliant with them. Id. Dr. Mimless noted that Gonsalves' extensive past history includes many psychiatric hospitalizations and several encounters with law enforcement. Id.
During Dr. Mimless' interview, Gonsalves' speech was laced with bizarre ideas, poor articulation, neologisms, perseveration, and an inability to answer questions with any degree of logic and clarity. Id. Instead of becoming more calm and coherent as the interview progressed, Dr. Mimless noted that Gonsalves' agitation escalated to a certain point after which he became labile, crying and threatening. Id. Gonsalves evidenced paranoid delusions, including threats of violence on certain persons; he demonstrated cognitive impairment and either was unable or unwilling to cooperate in orientation or memory testing; Gonsalves was unable to utilize any judgment whatsoever. Id.
Dr. Mimless diagnosed Gonsalves with chronic undifferentiated schizophrenia with an acute exacerbation; Gonsalves demonstrates severe personality disorder that has paranoid and schizotypal features. Id. Dr. Mimless found Gonsalves to be gravely ill and in need of a hospital skilled in dealing with acute psychiatric decompensations and extreme agitation associated with mental illness and extremely dangerous to the extent that interactions require extreme caution and careful planning; there should be no reasons for noncompliance with prescribed medication which should be administered against his will if necessary because without such medication, Gonsalves represents an imminent danger to himself and others. Id. "It would be negligent to deny this individual a treatment that is available as well as [to] deny him medication because he lacks the necessary judgment to make appropriate decisions about medical care." Id. Dr. Mimless stated that whatever legal maneuvers necessary to get Gonsalves treated in a hospital-like setting and to court-order medication would be beneficial to this man's mental and overall well-being. Dr. Mimless had no doubt that if Gonsalves is left in the psychiatric cell at the ACI and without treatment, Gonsalves will eventually remain regressed and agitated for the rest of his life. Id. Dr. Mimless stated specifically that, "[t]his interview was the closest I have ever come to seeing a human being act in such a primitive fashion that he more resembled a caged, agitated animal than a suffering mentally ill human being." Id.
In addition to transfer to Gonsalves for acute psychiatric hospitalization and administration of medication, even involuntarily, Dr. Mimless specifically recommended: (1) place Gonsalves in a secure environment establishing a behavioral treatment plan that sets up a reward inducing result for good behavior as there is no benefit to deny privileges to this man in this psychotic state, and (2) once Gonsalves is acutely stabilized, obtain additional consultation to set up a long term plan that meets the mental health needs of this individual as well as the protective needs of the society in which he is placed. Id.
In response to these psychiatric opinions, on August 24, 1994, the Director of Corrections petitioned ex parte for emergency transfer of Gonsalves from the ACI to the Forensic Unit. By interim order, Gonsalves was emergently transferred from the ACI to the Forensic Unit pursuant to Administrative Order No. 86-1 and R.I.G.L. 40.1-5.3-1 et. seq., Because a petition for transfer had previously been filed in accordance with §40.1-5.3-7, the matter was assigned for review and hearing on the daily criminal calendar on September 1, 1994. On September 1, 1994, Mr. Justice Gemma ordered that Mr. Gonsalves remain at the Forensic Unit for the purposes of psychiatric evaluation and/or treatment for a period of 46 days. Subsequently, court review of the matter was continued until December 5, 1994.
On December 5, 1994, the Court heard the DMHRH's petition requesting that Gonsalves be transferred back to the ACI pursuant to § 40.1-5.3-9. Mr. Gonsalves, by counsel, objected to transfer from the Forensic Unit to the ACI. In support of his objection, Gonsalves stated that: (1) he is not sufficiently recovered, (2) returning him to the ACI would constitute cruel and unusual treatment in violation of the Constitution of the United States and of the State of Rhode Island, and (3) the Forensic Unit has not prepared an adequate discharge plan. Id. After hearing and due deliberation, the Court ordered that: (1) [Gonsalves] may retain a psychiatrist and one other mental health professional to perform a record review, diagnostic evaluation and consultation in accordance with R.I.G.L. § 40.1-5.3-6 through 9; (2) [t]he Rhode Island Department of Corrections shall authorize the release of funds to pay for the expenses of the psychiatrist and other mental health professionals retained by [Gonsalves]; and that (3) this matter shall be heard on January 9, 1995. Subsequently, the matter was continued until January 19, 1995.
The Court heard testimony over five days during which both sides presented expert testimony concerning Gonsalves' psychiatric impairment and his prognosis.
C. Dennis Barton, Jr., M.D., Forensic Psychiatric Consultant on the Forensic Unit, testified on behalf of DMHRH. Paul G. Nestor, psychologist and Michael A. Ingalls, M.D., a psychiatrist, testified for Gonsalves. Additionally, Gonsalves presented Donald Ellerthorpe, Warden of the High Security Unit of the ACI and Dr. Finian Murphy, the Supervising Psychologist at the ACI.
Dr. Barton testified that according to records available to him, Gonsalves was committed twice in 1975; from October 19, 1976 to October 26, 1981; from November 10, 1992 to December 18, 1992; and from March 31, 1993 to April 12, 1993.
Dr. Barton testified consistent with his letter (Pet. 1 dated November 15, 1994) to the Court wherein he reported that,
 ". . . since that time, he (Gonsalves) has received oral and intramuscular medications for treatment of his psychiatric disorder (Schizoaffective Disorder, B, polar type).
 "as a result of his treatment, Mr. Gonsalves' mental illness has stabilized. He is fully compliant with the ward routine and cooperative with his treatment plan. He has demonstrated no acute psychiatric symptoms over the past two months. Because Mr. Gonsalves has not required any acute psychiatric intervention since late September and obviously no longer requires specialized psychiatric services on an acute treatment unit, I believe Mr. Gonsalves' continued maintenance treatment can be provided at the ACI."
During his examination, at the hearing, Dr. Barton initially provided that Gonsalves treatment, while committed, consisted of medication. When asked his opinion where Gonsalves could be treated, Dr. Barton testified that Gonsalves "no longer requires specialized psychiatric services. . ." However, on cross-examination Dr. Barton acknowledged that the Forensic Unit services minimally includes daily interventions by the nursing staff and mental health workers. Dr. Barton further testified that without ongoing treatment, specifically medications, Gonsalves will likely relapse to the psychotic state existing when he was recently transferred to the Forensic Unit.
Dr. Nestor, an expert testifying for Gonsalves, evaluated Gonsalves on December 19, 1994, and January 6, 1995. (Respondent Exhibit D). Dr. Nestor also noted that while a prisoner at the ACI, Gonsalves has required numerous transfers to the Forensic Unit for treatment of his psychiatric illness including: (1) from approximately 1976 to 1981 for psychosis with persecurtory delusions, (2) in 1992 for grossly disorganized and assaultive behavior described as delusional, and (3) in March of 1993, for competency evaluation on the charge of arson; he was described as delusional, stating that he was "sometimes bothered by spirits," but was nonetheless recommended as competent to stand trial. Id.
He was started on medications which were subsequently adjusted, diagnosed with chronic undifferentiated schizophrenia and antisocial personality disorder, returned to the ACI after approximately a two week hospitalization and upon discharge from the Forensic Unit, his condition was noted as "unchanged." (Respondent Exhibit G). At the time of that return to the ACI, recommendations for Gonsalves' aftercare plan by Dr. Ronald Mark Stewart, the Supervising Physician, included that Gonsalves will continue, as before, on his medications. Id. Specifically, Dr. Stewart stated that, "Mr. Gonsalves will have further problems with the law if [he] becomes delusional again and does not continue taking his prescribed medications." Id.
Dr. Nestor opined that Gonsalves meets the "statutory criteria for the involuntary commitment of a person who is both mentally ill and dangerous by reason of mental illness." (Respondent Exhibit D). Among his testimony, Dr. Nestor provided that Gonsalves "continues to demonstrate significant signs and symptoms of a severe mental illness" and that he is "frankly and persistently delusional;" demonstrated "no recognition that he is mentally ill," demonstrated no "ability to think that his perceptions of certain aspects of reality are substantially compromised by his ongoing and refractory mental illness." Id.
Gonsalves' delusions "may be viewed as the psychotic centerpiece of his illness from which much of his agitation, belligerence and paranoia evolve;" Gonsalves' "paranoia and agitation in response to gentle inquiries about the details of his beliefs revealed his inability to tolerate stress due to his persistent, psychotic delusions;" the delusions of Gonsalves which involve "personal or accessible targets as `malignant' or dangerous delusions, that is delusions that are associated with lethal or near lethal acts of violence directed at the target of the belief." Id. Dr. Nestor found that Gonsalves exhibits "near classic signs and symptoms of a serious mental illness, best characterized as a schizoaffective disorder, bipolar type." Id. Dr. Nestor stated that Gonsalves' serious mental illness is "best characterized by a substantial disorder in both thought and mood that grossly impairs Mr. Gonsalves' ability to perceive reality and to meet the everyday demands of life. As noted . . ., Mr. Gonsalves has become more behaviorally stable while hospitalized at the [Forensic Unit], but [he] has remained persistently psychotic." Id. Dr. Nestor found no clinical evidence to indicate that [Gonsalves] present active psychotic symptoms are related to his longstanding personality disorder or to malingering and further stated that Gonsalves' prognosis is bleak if he returns to the ACI. Id.
The second opinion sought by Gonsalves was from Dr. Ingall. Dr. Ingall interviewed Gonsalves on January 12, 1995. (Respondent Exhibit F). He noted, inter alia, that Gonsalves had fifty-five disciplinary infractions (bookings) at the ACI in the eleven months between September 1993 and August 1994. Id. Without medication, Gonsalves "is certain to regress to the violent, regressed, delusional state that he was in at the ACI. Especially important is the decanoate of Prolizin, which guarantees a constant supply of anti-psychotic medication." Id. Dr. Ingall stated that Gonsalves has a long-standing major psychiatric disorder, psychotic in nature, characterized by grandiose delusions and assaultive behavior; he also has a long-standing personality disorder. Id. Upon returning to the prison, Gonsalves will once again decompensate and require hospitalization. Id.
Further, Dr. Ingall stated,
 "While one might say that [Mr. Gonsalves] belongs in prison and should receive his medication there, the likelihood is, based on past experience that this will not go well. One might say that the prison should be set up so as to make sure the medication is given, but, in fact, this is not the case. One might say that the prison should respond to him in a more therapeutic fashion, but prisons are set up to punish, not to treat mental illness. In fact, it would be hard to create a more toxic environment to aggravate psychiatric illness than the prison. Mr. Gonsalves needs an environment staffed full-time with a multi-disciplinary mental health team." Id.
The Warden of the High Security Center of the ACI, Mr. Donald Ellerthorpe testified about the ACI procedures for managing mentally ill prisoners. In the High Security Center, the personnel have no specialized training nor is any training available in recognizing mental illness or dealing with such prisoners. The Warden testified that he personally had observed Gonsalves babbling on two or three occasions, including one occasion before Gonsalves was transferred to the Forensic Unit; the Warden did not refer him to a psychiatrist at the time. As to handling a prisoner with mental illness who becomes uncontrollable, a "cell extraction" occurs; regardless of an inmate's symptoms, that procedure entails using pepper gas or tear gas to incapacitate a non-compliant prisoner, six specially trained correctional officers enter the prisoner's cell and apply hand and leg shackles restraining the prisoner to the bed; the prisoner is isolated in a psychiatric cell which has no windows, except for the door; all restraining devices and clothing are removed; the prisoner is checked for injuries and remains in the cell until released by a psychiatrist. After remaining unstable for a period of time, the psychiatrist may petition for transfer of such a prisoner to the Forensic Unit. Such a transfer is very rare. In a psychiatric cell which measures seventy square feet, a prisoner experiences a higher degree of deprivation, including no exercise, no bed clothes, no utensils for eating, no cigarettes or matches, no eyeglasses, if any are worn, no pencil, paper or Bible; in some cases, a pair of briefs and a roll of toilet paper are allowed. An inmate may remain in a psychiatric cell as long as it is deemed appropriate by medical authorities.
The Warden went on to describe "punitive segregation" as the denial of certain entitlements or privileges enjoyed by other classes of prisoners; essentially, it is a discipline system of minimal entitlements meaning cell-bound, including for meals, a Bible, one hour of exercise only on Saturday, Sunday or a Holiday, and no visits or telephone calls except from an attorney or clergy. As a result of disciplinary violations while in the ACI, Gonsalves faces in excess of 999 days in punitive segregation upon his return to the ACI.
Dr. Murphy, the Supervising Psychologist at the ACI and recently named Coordinator of Professional services, testified as an expert in psychology and the psychological services available at the ACI. He stated that the ACI is not a mental health treatment facility; it has no psychiatric nurses or workers. Other than dispensing prescribed medication, basically no psychiatric services are available to mentally ill prisoners; it is the general practice at the ACI to not involuntarily medicate a prisoner. Gonsalves once spent over six months in a psychiatric cell. Having known Gonsalves for approximately seven years, Dr. Murphy testified that in his opinion and his staff's opinion, most of Gonsalves' disciplinary violations resulting in punishment, referred to as "bookings," if not all of them, are a direct result of his mental condition.
Dr. Murphy testified that Gonsalves has not sufficiently recovered his mental health such that he may return to the ACI. Procedurally, the power to transfer a mentally ill prisoner from the ACI to the Forensic Unit is vested in the psychiatrist; on many occasions, Dr. Murphy and his staff have pleaded with the psychiatrist to transfer Gonsalves to the Forensic Unit. Dr. Murphy started the proceedings to contest Gonsalves' return to the ACI because Gonsalves is in need of care that the ACI cannot provide.
DEFENDANT'S RETURN
At issue here is whether Gonsalves has sufficiently recovered his mental health so that this Court may order his return to the ACI. Section 40.1-5.3-9. Contrary to the DMHRH's position, Gonsalves argues, inter alia, that he is not sufficiently recovered. Title 40.1, Chapter 5.3, Section 9 specially provides,
 "When any person transferred pursuant to § 40.1-5.3-7 has sufficiently recovered his or her mental health, he or she may, upon petition of the director and by order of a justice of the Superior Court in his or her discretion, be transferred to the place of his or her original confinement, to serve out the remainder of his or her term of sentence."
In construing a statute, the Court "must ascertain and give effect to the intent of the Legislature. In so doing, [the court] consider[s] the entire statute as a whole; individual sections must be considered in context of the entire statutory scheme, not as if each section was independent of all other sections."Sorenson v. Colibri Corp., 650 A.2d 125, 128 (R.I. 1994). "Every word, sentence or provision in a statute is presumed to have some useful purpose and is intended to have some force and effect. Words used in a statute are to be given their plain and ordinary meaning." Gross v. State, Division of Taxation, 659 A.2d 670, 671-72 (R.I. 1995). Courts should "not ascribe to the Legislature an intent to enact legislation that is devoid of any purpose, is inefficacious, or is nugatory." Cocchini v. City of Providence,479 A.2d 108, 111 (R.I. 1984).
With respect to title 40.1, Chapter 5.3, Sections 1 and 6 through 18 comprise the statutory scheme for prisoners with psychiatric care needs.[3] In viewing the relevant sections, namely sections 1, 6 through 9, 13 and 14 as a whole, the statutory language evidences the legislative intent to provide the proper psychiatric care, treatment and restraint of mentally ill prisoners. Section 40.1-5.3-1 mandates that the Director "shall maintain an appropriate facility for confinement of persons committed to his or her custody pursuant to this chapter and shall provide for the proper care, treatment, and restraint of all such persons." (Emphasis added). This general construction of the Legislature's intent is also supported by the express language of § 14 which provides, in part, that,
 "Any person who has been committed or transferred to a facility for care and treatment pursuant to this chapter shall have a right to receive the care and treatment that is necessary for and appropriate to the condition for which he or she was committed or transferred and from which he or she can reasonable be expected to benefit."
Transfer and detention of prisoners requiring such psychiatric care in the Forensic Unit is contained in §§ 6 through 9 of the Act. Sections 6 and 7 of the statute provide for transfer of a mentally ill prisoner who requires specialized mental health care and psychiatric in-patient services which cannot be provided in a correctional facility to the forensic Unit. Section 6 allows for the emergent transfer of a mentally ill inmate. In conjunction with § 6, Administrative Order 86-1 provides the procedure for examination and transfer of persons convicted and imprisoned for crime pursuant to § 40.1-5.3-6.
The procedure to be followed in non-emergent cases is found in section 7(a). That section states, in relevant part, that "[u]pon receipt of [a] petition and appropriate notice . . . the court shall hold a hearing at which the parties may introduce evidence bearing on the mental condition of the person. The person who is the subject of the petition may testify, confront witnesses and present evidence." Section 40.1-5.3-7(a). Nonemergent transfer of a prisoner to the Forensic Unit expressly requires prior notice, hearing and a judicial order. Section40.1-5.3-7. For such an order to issue, the "court [must find] by clear and convincing evidence that the person is mentally ill and requires specialized mental health care and psychiatric in-patient services which cannot be provided in a correctional facility." Section 40.1-5.3-7(b). Only upon the court finding that: (1) the person is mentally ill and (2) the person requires specialized mental health care which cannot be provided in a correctional facility, may the court order transfer of a prisoner from the ACI to be detained in the Forensic Unit. Section 40.1-5.3-7(b).
Once a court so finds by clear and convincing evidence, as was done in the instant case, the court may order transfer of the prisoner from the ACI to be detained in the Forensic Unit. While the language of the present Act has not been construed by our Supreme Court, the language of the predecessor statute has been. In dealing with transfer of mentally ill prisoners, it expressly provided that transfer could be ordered by the court only "upon examination" by the court. Genereux v. Pelosi, 96 R.I. 452, 456-57, 192 A.2d 630, 632 (1963). In construing that statute, our Supreme Court determined that the Legislature "clearly evidenced an intention that the question of whether an accused should be removed to the criminal insane ward would be judicially and not medically determined. If [the Legislature] had contemplated otherwise, the words `upon examination' would have been omitted from such section [because] unless construed as [the Supreme Court has] construed them, they are surplusage." Id. at 456, 192 A.2d at 632. Although the statute may not explicitly demand a hearing, our Supreme Court has held that a hearing is implicit within the requirement of a judicial determination of mental capacity. Id. "The statute provides that an order for such transfer may be made whenever the presiding justice of the superior court is satisfied that the transfer is in the best interests of the prisoner, making [such a] decision only after such examination as [the justice] may deem proper." Dep't ofSocial Welfare v. Genereux, 98 R.I. 334, 339, 201 A.2d 914, 917-18 (1964). Thus, the plain and clear language of the statute evidences that the legislative intent that the Superior Court determine whether a transfer is in the best interests of a mentally ill prisoner.
Furthermore, return of a prisoner ordered transferred and detained in the forensic Unit under §§ 6 or 7 to the place of his or her original confinement (return transfer), here the ACI, requires a court order. Section 40.1-5.3-9. Section 9 states,
 "When any person transferred pursuant to § 40.1-5.3-7 has sufficiently recovered his or her mental health, he or she may, upon petition of the director and by order of a justice of the superior Court in his or her discretion, be transferred to the place of his or her original confinement, to serve out the remainder of his or her term of sentence."
Thus, a petition by the Director requires the Court's evaluation of such a matter. In the absence of petition by the Director and subsequent court order under this section, a prisoner transferred to the Forensic Unit under § 7 would be detained for the remainder of his or her sentence. Section 40.1-5.3-8. Section 8 of the Act expressly provides, in relevant part, that the duration of the detention in the Forensic Unit "shall be for and during the term of the prisoner's sentence." Id. The express language of § 9 provides that return transfer may occur when such prisoner has sufficiently recovered his or her mental health, upon the Director's petition and if the court so orders in its discretion. Thus, a court's order for the Director to detain such a prisoner stands unless or until superseded by a § 9 court order for return transfer. In construing sections 6 through 9, this Court finds that the Legislature did not intend for the Director to independently transfer a mentally ill prisoner. Further, the statutory language evidences that the Legislature intends that the court determine whether, in the court's discretion, a transfer is in the best interests of such a mentally ill prisoner.
With respect to determining whether or not a mentally ill prisoner should be returned to the place of original confinement, here the ACI, the Act does not specifically provide a quantum of evidence standard. Gonsalves urges that such finding must be made by the same quantum required for commitments, that is the clear and convincing standard. Conversely, the DMHRH contends that a court hearing is not required or alternatively, if a court hearing is required, that the clear and convincing quantum is not the appropriate standard of evidence. Section 9 specifically provides that, [w]hen any person transferred . . . has sufficiently recovered his or her mental health, he or she may, upon petition of the director and by order of a justice of the superior court in his or her discretion, be transferred. . . ." Section 40.1-5.3-9. "[I]t is not within the province of this court to insert in a statute words or language that does not appear therein except in those cases where it is plainly evident from the statute itself that the legislature intended that the statute contain such provisions." New England Die Co., v. GeneralProducts Co., 92 R.I. 292, 298, 168 A.2d 150, 154 (1961). Here, it is not plainly evident that the Legislature intended that § 9 require a finding by clear and convincing evidence. Rather, the language of § 9 empowers the court to exercise its discretion. "The term `discretion' imports an action taken by the trial justice in the light of reason. Due regard is given for what is right and equitable under all of the circumstances and the law."State v. Allan, 433 A.2d 222, 225 (R.I. 1981). Under § 9, which is a separate statutory section, a return transfer order results from the court exercising its discretion.
With respect to the instant petition, the Court heard from experts for both sides, the Warden of the High Security Unit of the ACI and the Supervising Psychologist at the ACI. It is undisputed that Gonsalves has a major psychiatric illness and a personality disorder. It is undisputed that Gonsalves requires medications to assist in controlling his psychiatric disorder. It is undisputed that Gonsalves decompensates without the appropriate psychotropic medication regimen and that stress, such as confinement in the psychiatric cell at the ACI, exacerbates Gonsalves' psychosis. Although Dr. Barton testified that Gonsalves no longer needs the acute services of the Forensic Unit, this Court is not convinced, nor does it find, that Gonsalves has sufficiently recovered his mental health such that a return transfer order should issue. Further, the evidence before this Court demonstrates that confinement in the ACI causes Gonsalves to become more psychotic. Although not determinative, the testimony clearly indicates that the ACI does not provide the specialized psychiatric care that Gonsalves requires. Mentally ill prisoners who are committed to the custody of the Director remain at the Forensic Unit until a court order issues. Pursuant to § 40.1-5.3-9, such an order issues when the court determines that such a prisoner has sufficiently recovered his or her mental health. Dr. Nestor, Dr. Ingall, and Dr. Murphy all believe that Gonsalves is not a candidate for return transfer because he has not sufficiently recovered his mental health.
CONCLUSION
After review of the evidence, testimony, and memoranda, the Court finds that Mr. Gonsalves has not sufficiently recovered his mental health and thus may not be transferred pursuant to §40.1-5.3-9.
Counsel shall prepare an order consistent with this decision.
[1] The Institute of Mental Health's (IMH) name was changed to Eleanor Slater Hospital. For purposes of consistency, this opinion will refer to the Forensic Unit as meaning the facility for the confinement of persons committed to the custody of the state director of mental health, retardation and hospitals for their proper care, treatment and restraint. Rhode Island General Laws § 40.1-5.3-1.
[2] Administrative Order No. 86-1 enumerates the procedures for examination and transfer of persons convicted and imprisoned for crimes pursuant to Sections 40.1-5.3-6 et. seq., G.L. 1956 (1984 Reenactment). It provides, in relevant part, the following: (1) a § 6 petition shall be assigned for hearing to the daily criminal calendar. Any justice of the superior court may order the examination provided for in said section and set the petition for hearing to a date certain on the daily criminal calendar; (2) In the event that the mental illness of an inmate creates a need for emergency treatment, such petition shall include a request for immediate transfer to the facility provided for in section40.1-5.3-1 for emergency treatment and examination. An order granting such a petition shall set the petition for hearing to a date certain on the daily criminal calendar to determine whether the inmate should continue to be confined at the Forensic Unit or should be returned to the facility from which he or she was transferred; and (3) A petition for immediate transfer for emergency treatment and examination shall be accompanied, whenever possible, by the affidavit of a psychiatrist setting forth the need for such immediate transfer.
[3] Sections 10 through 12 which relate to expenses and sections 15 through 17 which relate to confidentiality, statement of rights and penalties for deprivation of rights implicated are not patently relevant to the instant case.